## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUCIANO DI SCALA, individually and on behalf of all others similarly situated,<br><br>                     Plaintiff,<br><br>       v.<br><br>PROSHARES ULTRA BLOOMBERG CRUDE OIL, PROSHARE CAPITAL MANAGEMENT LLC, PROSHARES TRUST II, MICHAEL L. SAPIR, TIMOTHY N. COAKLEY, and TODD B. JOHNSON,<br><br>                  Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Jury Trial Demanded |

Plaintiff Luciano Di Scala ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to his own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

### NATURE AND SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired UCO securities from March 6, 2020 and April 27, 2020, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2. UCO is an exchange traded fund ("ETF"), which as discussed below, is purportedly designed to reflect the performance of crude oil as measured by the price of West Texas Intermediate ("WTI") sweet, light crude oil futures contracts traded on the New York Mercantile Exchange (the "NYMEX"). Shares of UCO trade on the NYSEArca stock exchange under the ticker ("UCO").

3. Because retail investors are generally not equipped to buy and sell barrels of oil or authorized to trade oil futures, ETFs like UCO provide one of the primary means by which such investors can gain exposure to fluctuations in oil prices. WTI is the main oil benchmark for North America as it is sourced from the United States, primarily from the Permian Basin. The oil comes mainly from Texas, then travels through refineries. The main delivery and price settlement point for WTI is Cushing, Oklahoma.

4. UCO stated that it would achieve its investment objective by seeking daily investment results, before fees and expenses, that correspond to two times the performance of its benchmark for a single day, and not for any other period. UCO stated that it would not seek to achieve its stated objective over a period greater than a single day. UCO has stated that it would seek to engage in a daily rebalancing to its position so that its exposure to its benchmark is consistent with its daily investment objective.

5. However, unbeknownst to investors, extraordinary market conditions in early 2020 made UCO's purported investment objective and strategy unfeasible. Oil demand fell precipitously as governments imposed lockdowns and businesses halted operations in response to the COVID-19 pandemic. Moreover, in early March 2020, Saudi Arabia and Russia launched an oil price war, increasing production and slashing export prices in a bid to increase the global market share of their domestic petrochemical enterprises. As excess oil supply increased and oil

prices waned, the facilities available for storage in Cushing, Oklahoma approached capacity, ultimately causing a rare market dynamic known as "super contango," in which the futures prices for oil substantially exceed the spot price. At the same time, retail investors began pouring hundreds of millions of dollars into UCO in an attempt to "buy the dip," believing (correctly) that the price of oil would rebound as economies exited lockdown periods and the Russia/Saudi oil price war ended. Because of the nature of UCO's investment strategy, these converging factors caused UCO to suffer exceptional losses and undermined UCO's ability to meet its ostensible investment objective.

6.     Defendants, as the creators, issuers, and operations of UCO, possessed inside knowledge about the negative consequences to UCO as a result of these converging factors. However, rather than disclose the known impacts and risks to UCO as a result of these exceptional threats, Defendants instead conducted a massive offering of UCO shares, ultimately selling billions of dollars' worth of UCO shares to the market.

7.     On March 6, 2020, Defendants announced a public offering of up to $5,123,657,025 in UCO shares via a Form S-3 Registration Statement filed with the SEC. On March 5, 2020, the day before Defendants filed this Registration Statement, UCO shares closed at approximately $11.29 each.[1]

8.     As the month of March progressed, Defendants twice updated this Registration Statement – via amendments on March 25, 2020 and March 30, 2020.

---

[1] As detailed herein, on April 21, 2020, UCO had a 1:25 reverse split. Accordingly, using post-reverse split valuation, a shareholder who purchased a share on March 5, 2020 at $11.29 had an effective cost basis of $282.25 for that share ($11.29 x 25 = $282.25).

9.     The Registration Statement and its amendments failed to disclose and/or misrepresented the concrete harms and acute risks to the Fund posed by the COVID-19 pandemic, the Russia/Saudi oil price war, the massive influx of investor capital into the Fund, the fact that the Fund was approaching position and accountability limits, the effects of super contango, and insufficient WTI storage capacity.

10.     UCO quickly deteriorated, as a result of the nature and extent of Defendants' fraud being revealed to investors and the market. On April 28, 2020, one week after the reverse split, UCO shares closed at just $12.04 each, or around $0.4814 when compared to the pre-reverse split valuation. Ultimately, UCO suffered billions of dollars in losses and was forced to abandon its investment strategy. Through a series of investment overhauls, UCO was forced to transform from the passive ETF an actively-managed fund struggling to avoid a total implosion. In April and May 2020, Defendants belatedly acknowledged the threats and adverse impacts that UCO had been experiencing at the time of the March offering, but which they had failed to disclose to investors in a timely manner.

11.     Defendants are liable for: (i) making false and misleading statements; and (ii) failing to disclose adverse facts known to them about UCO. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of UCO securities was a success, as it: (i) deceived the investing public regarding UCO's business, prospects, and risks; (ii) artificially inflated the prices of UCO securities; and (iii) caused Plaintiff and other members of the Class to purchase UCO securities at artificially inflated prices.

12.     As a result of Defendants' material misrepresentations and omissions during the Class Period, Plaintiff and members of the Class (defined below) suffered billions of dollars in losses.

## JURISDICTION AND VENUE

13.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

17.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiff Luciano Di Scala is a resident of Shirley, New York. He acquired and held shares of UCO at artificially inflated prices during the class period, and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

19.     Defendant ProShares Ultra Bloomberg Crude Oil is an ETF that trades on the NYSEArca under the ticker "UCO." Its filings with the SEC are made by Defendant ProShares Trust II, which is sponsored by Defendant ProShare Capital Management LLC.

20.     Defendant ProShares Trust II is a Delaware statutory trust organized into separate series, one such series being UCO.

21.     Defendant ProShare Capital Management LLC is the Sponsor of ProShares Trust II (with ProShares Trust II, the "Sponsor" or "ProShares"). ProShare Capital Management LLC's headquarters are located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, MD 20814, and ProShares Trust II is incorporated under the laws of the State of Delaware.

22.     Defendant Michael L. Sapir is the Chief Executive Officer and Principal of ProShare Capital Management LLC.

23.     Defendant Timothy N. Coakley is the Chief Financial Officer and Principal of ProShare Capital Management LLC.

24.     Defendant Todd B. Johnson is the Principal Executive Officer of ProShares Trust II and the Chief Investment Officer and Principal of ProShare Capital Management LLC. The Sponsor has also designated that Mr. Johnson is the "principal of the Sponsor who supervises persons who participate in making trading decisions for" UCO.

25.     Collectively, Defendants Sapir, Coakley, and Johnson are referred to throughout this complaint as the "Individual Defendants."

26.     The Individual Defendants, because of their positions at the Sponsor, possessed the power and authority to control the content and form of UCO's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with

the Sponsor and access to material non-public information available to them but not to the public,

the Individual Defendants knew that the adverse facts specified herein had not been disclosed to

and were being concealed from the public and that the positive representations being made were

false and misleading. The Individual Defendants are liable for the false statements pleaded

herein.

## SUBSTANTIVE ALLEGATIONS

27.     UCO is an ETF that seeks daily investment results, before fees and expenses, that

correspond to two times (2x) the daily performance of the Bloomberg WTI Crude Oil

Subindex$^{SM}$. Because most retail investors are not equipped to buy and sell barrels of oil or

authorized to trade oil futures contracts, they utilize ETFs such as UCO to make investments

based on the price of oil and to gain investment exposure to fluctuations in spot oil prices.

28.     UCO is designed to "not [be] actively managed by traditional methods," but

instead, "seeks to remain fully invested at all times in Financial Instruments and money market

instruments that, in combination, provide exposure to its underlying benchmark consistent with

its investment objective, even during periods in which the benchmark is flat or moving in a

manner that may cause the value of [UCO] to decline."[2] UCO does not seek to achieve its stated

objective over a period greater than a single day.

29.     The benchmark used by UCO, the Bloomberg WTI Crude Oil Subindex, is

intended to reflect the performance of crude oil as measured by the price of WTI sweet, light

crude oil futures contracts traded on the NYMEX. According to UCO's March 6, 2020

---

[2]  *See*  Mar.  6,  2020  Registration  Statement  filed  on  Form  S-3  with  the  SEC, https://www.sec.gov/Archives/edgar/data/1415311/000119312520063305/d854165ds3.htm#txa854165_13, at 2.

Registration Statement filed on Form S-3 with the SEC,[3] UCO is designed to:

> [N]ot [be] directly linked to the 'spot price' of crude oil. The price of a futures contract reflects the expected value of the commodity upon delivery in the future, whereas the spot price of a commodity reflects the immediate delivery values of the commodity. While prices of swaps, futures contracts and other derivatives contracts are related to the prices of an underlying cash market (i.e., the "spot" market), they may not be well correlated and have typically performed very differently. Crude oil futures contracts typically perform very differently from, and commonly underperform, the spot price of crude oil due to current (and future expectations of) factors such as storage costs, geopolitical risks, interest charges incurred to finance the purchase of the commodity, and expectations concerning supply and demand for the commodity. It is possible that during certain time periods derivatives contract prices may not be correlated to spot market prices and may be substantially lower or higher than the spot market prices for WTI crude oil as a result of differences in derivatives contract terms or as supply, demand or other economic or regulatory factors become more pronounced in either the cash or derivatives markets.

30.    By this March 6, 2020 Registration Statement, UCO registered for an Offering with a "Proposed Maximum Aggregate Offering Price" of $5,123,657,025.

31.    A futures contract is a legal agreement to buy or sell a particular commodity at a predetermined price at a specified time in the future. The buyer of a futures contract takes on the obligation to buy and receive the underlying asset when the futures contract expires, while the seller of a futures contract takes on the obligation to deliver the underlying asset at expiration. Futures contracts can be used to hedge other investments, to protect against fluctuations in the price of a commodity, or as a speculative investment.

32.    The same Registration Statement explains that UCO:

> [I]s "geared" which means that [it] has an investment objective to seek daily investment results, before fees and expenses that correspond either to a multiple (2x) or an inverse multiple (-2x) of the performance of a benchmark for a single day, not for any other period. A "single day" is measured from the time a Fund

_____

[3] https://www.sec.gov/Archives/edgar/data/1415311/000119312520063305/d854165ds3.htm at 13.

calculates its respective net asset value ("NAV") to the time of the Fund's next NAV calculation. . . . In order to achieve its investment objective, each of the Funds [including UCO] intends to invest in financial instruments . . . in the manner and to the extent described herein.[4]

33.     The same Registration Statement further described the benchmark UCO was designed to track as:

**Bloomberg WTI Crude Oil Subindex**[SM]

The Oil Funds seek investment results, before fees and expenses, that correspond to two times (2x) or two times the inverse (-2x) of the daily performance of the Oil Subindex, a subindex of the Bloomberg Commodity Index. The Oil Subindex is intended to reflect the performance of crude oil as measured by the price of futures contracts of WTI sweet, light crude oil traded on the NYMEX, including the impact of rolling, without regard to income earned on cash positions. The Oil Subindex is not directly linked to the "spot" price of crude oil. Futures contracts may perform very differently from the spot price of crude oil.

The Oil Subindex is based on the crude oil component of the Bloomberg Commodity Index and tracks what is known as a rolling futures position. Unlike equities, which entitle the holder to a continuing stake in a corporation, commodity futures contracts specify a delivery date for the underlying physical commodity or its cash equivalent. The Oil Subindex is a "rolling index," which means that the Oil Subindex does not take physical possession of any commodities. An investor with a rolling futures position is able to avoid delivering (or taking delivery of) underlying physical commodities while maintaining exposure to those commodities. The roll occurs over a period of five Bloomberg Commodity Index business days in pre-determined months according to the Bloomberg Commodity Index contract schedule, generally beginning on the sixth business day of the month and ending on the tenth business day. Each day during the roll period, approximately 20% of the expiring futures position will be rolled into a new contract with a longer dated expiry, increasing from 0% to 20%, 40%, 60%, 80% and finally 100%. The Oil Subindex will reflect the performance of its underlying crude oil futures contracts, including the impact of rolling, without regard to income earned on cash positions.[5]

---

[4] *Id.* at Table of Contents. To be clear, UCO was designed to seek daily investment results, before fees and expenses, of two times (2x) the daily performance of the Oil Subindex, a subindex of the Bloomberg Commodity Index. A different security offered by ProShares Trust II, ProShares UltraShort Bloomberg Crude Oil (which trades under the ticker "SCO," is the security that was designed to correspond to two times the inverse (-2x) of the Oil Subindex.
[5] *Id.* at 27.

34.    Many investors, including UCO, trade futures contracts without any expectation of ever taking or delivering the underlying asset. Instead, these investors close out their positions prior to contract expiry. In the case of UCO, the Fund rolled over its futures contract positions every month by selling its current WTI futures contracts holdings and then using the proceeds to buy the subsequent WTI futures contracts, as detailed above.

35.    UCO's efforts to roll its portfolio over every month to the subsequent futures contracts subjected the Fund to market forces known as "backwardation" and "contango." In the event of a crude oil futures market where near month contracts trade at a higher price than next month to expire contracts, a situation described as "backwardation," then the value of the contract would tend to rise as it approaches expiration. Conversely, in the event of a crude oil futures market where near month contracts trade at a lower price than next month contracts, a situation described as "contango," then the value of the benchmark contract would tend to decline as it approaches expiration.

36.    UCO    publishes    its    NAV    per    share    daily    on    its    website, https://www.proshares.com/funds/uco.html. As an ETF, the market price for UCO shares can reflect either a premium or a discount to the Fund's NAV. However, because market makers, known as "authorized participants," can buy new shares or redeem outstanding shares from the Fund, arbitrage opportunities generally cause daily changes in UCO's share price on the NYSEArca to closely track daily changes in UCO's NAV.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

37.    Demand for oil suffered a precipitous decline in early 2020 due to the global coronavirus pandemic. National, state, and local governments imposed mandatory lockdowns to mitigate the spread of the disease. Businesses closed and consumer spending plummeted.

38.     Adding to pricing pressures, on March 8, 2020, the Kingdom of Saudi Arabia unexpectedly announced price discounts for its oil exports of $6 to $8 per barrel to its customers in Europe, Asia, and the United States. The next day, the price of WTI fell 25%, its biggest single-day decline in decades. In the days that followed, Saudi Arabia and Russia announced significant increases in oil production, further depressing crude oil prices. By March 18, 2020, WTI fell below $21 per barrel, an 18-year low and less than half the price of just two weeks previously.

39.     Around this same time, retail investors began pouring hundreds of millions of dollars into UCO to "buy the dip" in oil prices, expecting (correctly) that the price of oil would rise as the market effects of the coronavirus pandemic and the Russia/Saudi oil price war waned. However, unbeknownst to investors – but well known to Defendants – the recent market volatility and massive influx of investor capital had created adverse trends and extreme risks set to implode UCO's value and which threatened UCO's very existence. As UCO ballooned in size, with its up to $4.5 billion March 2020 Offering alone, UCO also encountered position limits that impaired its ability to achieve its investment objective and liquidity constraints that amplified its losses.

40.     In addition, the WTI near future contracts that formed almost the entirety of UCO's portfolio entered a period of "super contango," a rare event that occurs when the spot price trades substantially below the futures price. This dynamic was exacerbated because the inventory space available to store WTI barrels in Cushing, Oklahoma was quickly filling up due to excess supply, significantly increasing the costs to store delivered oil barrels. By March 23, 2020, the contango between near month and next month WTI futures contracts reached $2.12, an increase of more than 1,500% as compared to the contango that existed at the beginning of

March. As the near month WTI futures contracts held by UCO approached expiry and converged

on the spot price, UCO suffered devastating losses and was set to suffer even greater losses when

it rolled forward into significantly more expensive next month contracts.

41. Defendants, as the creators, issuers, and operators of UCO and active market-

making players in the complex commodities and futures markets that determined UCO's

performance, possessed unique insider knowledge about the negative consequences to the Fund

as a result of these converging adverse events. However, rather than disclose the known impacts

and risks to UCO as a result of these exceptional threats, defendants decided to conduct a massive

offering of UCO shares to public investors. Even though the risk profile for UCO had profoundly

changed, solicitation materials for the Offering substantially mirrored the Fund's prior

disclosures. Indeed, unbeknownst to investors, the Offering itself materially increased the risks

to the Fund because it heightened liquidity constraints in the WTI futures market and pushed the

Fund towards position limits as the Sponsor piled hundreds of millions of dollars from Offering

proceeds into the Fund's purported investment strategy.

42. The Class Period begins on March 6, 2020, when UCO filed a Registration

Statement on Form S-3 with the SEC. Through this Registration Statement, corresponding to

SEC file number 333-236926, UCO set a "Proposed Maximum Aggregate Offering Price" of

$5,123,657,025.

43. Numerous representations to investors in the Registration Statement were

materially false and misleading when made. For example, despite the severity of the adverse

market trends impacting UCO, which caused UCO to suffer hundreds of millions of dollars in

losses and threatened UCO's very existence, the Registration Statement contained substantially

the same generic boilerplate risk discosures that UCO had provided in past registration

statements. The Registration Statement failed to inform investors of the developing extreme market conditions in the WTI oil market. The Registration Statement does not mention the effects of the developing "super contango," the specific impacts of ongoing market volatility on UCO, or the fact that UCO was approaching position limits and liquidity constraints because of the massive influx of investor capital into UCO (an adverse trend accelerated by the Offering itself).

44.    The Registration Statement also failed to provide any specifics regarding the effects of the COVID-19 pandemic. Indeed, none of the words "pandemic," "coronavirus," or "COVID-19" even appear in the Registration Statement. Rather, the Registration Statement merely contains generic, boilerplate language regarding "Risks Specific to the Oil and Precious Metals Markets and Funds," such as "[g]eneral economic conditions in the world or in a major region, such as population growth rates, periods of civil unrest, government austerity programs, or currency exchange rate fluctuations may affect prices of underlying commodities." Furthermore, the Registration Statement merely provides the boilerplate "[t]he presence of contango in certain futures contracts at the time of rolling would be expected to adversely affect the Funds with long positions, and positively affect the Funds with short positions."

45.    These statements were materially false and misleading when made. At the time of the Offering, UCO had already been severely impacted by increased volatility in oil and oil-related markets and reduced oil demand as a result of the COVID-19 pandemic, which had compromised UCO's ability to achieve its investment strategy and objective and caused UCO to suffer hundreds of millions of dollars in losses. Moreover, the Registration Statement's discussion of general factors that "could" impact oil supply and demand omitted to discuss the major impacts that UCO was already suffering.

46.     The March 6, 2020 Registration Statement also misrepresented UCO's investment objective and principal investment strategies. Rather than disclose that UCO already knew it was going to change its investment objective and strategies, the Registration Statement merely contained generic boilerplate disclosures such as "[t]here may be circumstances that could prevent or make it impractical for a Fund to operate in a manner consistent with its investment objective and principal investment strategies." The Registration Statement represented that UCO would achieve its investment objective by seeking daily investment results, before fees and expenses, that correspond to two times (2x) the daily performance of the Bloomberg WTI Crude Oil Subindex$^{SM}$.

47.     The March 6, 2020 Registration Statement further claimed that UCO was "not actively managed by traditional methods (*e.g.*, by effecting changes in the composition of a portfolio on the basis of judgements [sic] relating to economic, financial and market conditions with a view toward obtaining positive results under all market conditions). Each Fund seeks to remain invested at all times in Financial Instruments and money market instruments that, in combination, provide exposure to its underlying benchmark consistent with its investment objective without regard to market conditions, trends or direction." Yet UCO know it could not pursue the claimed passive investment strategy or objective portrayed in the March 6, 2020 Registration Statement because of the host of interrelated crises that had undermined UCO's ability to invest pursuant to the stated objective.

48.     On March 25, 2020, UCO filed an amended Registration Statement on Form S-

3/A with the SEC.[6] This Form S-3/A amended Registration Statement contains similar misstatements and omissions as those alleged in UCO's March 6, 2020 Registration Statement. In this March 25, 2020 Registration Statement, UCO again set a "Proposed Maximum Aggregate Offering Price" of $5,123,657,025.

49.    The March 25, 2020 amended Registration Statement reiterates the same generic, boilerplate language concerning the possibility of a contango and that a contango could adversely affect UCO, but omitted to state the existence of the super contango and the capacity shortage at Cushing, Oklahoma. Nowhere in the March 25, 2020 amended Registration Statement do Defendants disclose the existence of the super contango, and indeed, neither "Cushing" nor "Oklahoma" appears anywhere in the document.

50.    In its March 25, 2020 amended Registration Statement, UCO acknowledged the existence of the COVID-19 pandemic, but only in general terms. This document provided that "[c]ontemporaneous with the onset of the COVID-19 pandemic in the US, oil experienced shocks to supply and demand, impacting the price and volatility of oil. The global economic shocks being experienced as of the date hereof *may* cause the underlying assumptions and expectations of the Funds to become outdated quickly or inaccurate, resulting in significant losses." However, the March 25, 2020 amended Registration Statement failed to disclose that UCO's investment strategy and objective had already become outdated and that UCO would have to change course from its traditional, passive investment strategy. Indeed, in this document, Defendants reiterated that UCO "seeks to meet its investment objective by investing, under

---

[6] https://www.sec.gov/Archives/edgar/data/1415311/000119312520084056/d854165ds3a.htm.

normal market conditions, in any one of, or combinations of Financial Instruments . . . based on WTI sweet, light crude oil." The language is a verbatim cut and paste from the March 6, 2020 Registration Statement, without any meaningful update or disclosure.

51.     The March 25, 2020 amended Registration Statement also misrepresented UCO's investment objective and principal investment strategies. Rather than disclose that UCO already knew it was going to change its investment objective and strategies, the Registration Statement merely contained generic boilerplate disclosures such as "[t]here may be circumstances that could prevent or make it impractical for a Fund to operate in a manner consistent with its investment objective and principal investment strategies." This amdended Registration Statement represented that UCO would achieve its investment objective by seeking daily investment results, before fees and expenses, that correspond to two times (2x) the daily performance of the Bloomberg WTI Crude Oil Subindex$^{SM}$.

52.     The March 25, 2020 amended Registration Statement further claimed that UCO was "not actively managed by traditional methods (*e.g.*, by effecting changes in the composition of a portfolio on the basis of judgements [sic] relating to economic, financial and market conditions with a view toward obtaining positive results under all market conditions). Each Fund seeks to remain invested at all times in Financial Instruments and money market instruments that, in combination, provide exposure to its underlying benchmark consistent with its investment objective without regard to market conditions, trends or direction." Yet UCO know it could not pursue the claimed passive investment strategy or objective portrayed in the March 25, 2020 amended Registration Statement because of the host of interrelated crises that had undermined UCO's ability to invest pursuant to the stated objective.

53.     Furthermore, the March 25, 2020 amended Registration Statement still failed to

acknowledge the presence of contango on the oil market, the existence of the Russia/Saudi oil price war, or insufficient WTI storage capacity at Cushing, Oklahoma.

54.    Next, on March 30, 2020, UCO filed an amended Registration Statement on Form S-3/A with the SEC.[7] This Form S-3/A amended Registration Statement contains similar misstatements and omissions as those alleged in UCO's March 6, 2020 Registration Statement. In addition, the March 30, 2020 Form S-3/A listed the "Proposed Maximum Aggregate Offering Price" for UCO as $4,555,433,103.

55.    This March 30, 2020 amended Registration Statement contained the same generic and materially-deficient boilerplate cautionary language concerning the impact of the COVID-19 pandemic on the oil market as the March 25, 2020 amended Registration Statement. Again, UCO only stated that the "global economic shocks being experienced as of the date hereof *may* cause the underlying assumptions and expectations of the Funds to become outdated quickly or inaccurate," rather than disclosing the impact that the pandemic had already had on UCO.

56.    The March 30, 2020 amended Registration Statement failed to disclose that UCO's investment strategy and objective had already become outdated and that UCO would have to change course from its traditional, passive investment strategy. In this document, Defendants again repeated the same language quoted above from the March 25, 2020 amended Registration Statement concerning UCO's investment strategy and objective.

57.    The March 30, 2020 amended Registration Statement also misrepresented UCO's investment objective and principal investment strategies. Rather than disclose that UCO already

---

[7] https://www.sec.gov/Archives/edgar/data/1415311/000119312520090819/d854165ds3a.htm.

knew it was going to change its investment objective and strategies, the Registration Statement merely contained generic boilerplate disclosures such as "[t]here may be circumstances that could prevent or make it impractical for a Fund to operate in a manner consistent with its investment objective and principal investment strategies." The March 30, 2020 amended Registration Statement represented that UCO would achieve its investment objective by seeking daily investment results, before fees and expenses, that correspond to two times (2x) the daily performance of the Bloomberg WTI Crude Oil Subindex[SM].

58.    The March 30, 2020 amended Registration Statement further claimed that UCO was "not actively managed by traditional methods (*e.g.*, by effecting changes in the composition of a portfolio on the basis of judgements [sic] relating to economic, financial and market conditions with a view toward obtaining positive results under all market conditions). Each Fund seeks to remain invested at all times in Financial Instruments and money market instruments that, in combination, provide exposure to its underlying benchmark consistent with its investment objective without regard to market conditions, trends or direction." Yet UCO know it could not pursue the claimed passive investment strategy or objective portrayed in the March 30, 2020 amended Registration Statement because of the host of interrelated crises that had undermined UCO's ability to invest pursuant to the stated objective.

59.    Furthermore, the March 30, 2020 amended Registration Statement still failed to acknowledge the presence of contango on the oil market, the existence of the Russia/Saudi oil price war, or insufficient WTI storage capacity.

60.    On March 30, 2020, the SEC declared the Registration Statement corresponding

to SEC File Number 333-236926 effective.[8]

61.     The statements described above were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. As discussed below, the Defendants misled investors by misrepresenting and/or failing to disclose adverse facts known to Defendants. As a result, the Company's public statements were materially false and misleading at all relevant times.

62.     Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of the Registration Statement, "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky" and that each risk factor "adequately describe[] the risk." The failure of the Registration Statement to disclose the concrete harms and acute risks to the Fund posed by the coronavirus pandemic, the Russia/Saudi oil price war, the massive influx of investor capital into the Fund, the fact that the Fund was approaching position and accountability limits, the effects of super contango, and insufficient WTI storage capacity violated Item 303 because these undisclosed risks were known to defendants and would (and did) have an unfavorable impact on UCO's revenues and income from continuing operations. This failure also violated Item 105 because these specific risks were not adequately disclosed, or disclosed at all, even

---

[8] https://www.sec.gov/Archives/edgar/data/1415311/999999999520000636/xslEFFECTX01/primary_doc.xml.

though they were some of the most significant factors that made an investment in UCO securities speculative or risky.

63.     The statements described in ¶¶ 41-62 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, UCO could not pursue the claimed passive investment strategy or objective portrayed in the Registration Statement because the Fund was facing a host of interrelated crises that had undermined its ability to pursue its stated investment objective and strategy, including: (1) extraordinary market volatility caused by decreased demand for oil from the coronavirus pandemic and increased oil supply and diminished oil prices caused by the Russia/Saudi oil price war; (2) a massive influx of investor capital into the Fund, totaling hundreds of millions of dollars, in a matter of days, which increased Fund inefficiencies, heightened illiquidity in the WTI futures contract markets in which the Fund invested, and caused the Fund to approach positional and regulatory limits (adverse trends exacerbated by the Offering itself); and (3) a sharp divergence between spot and future prices in the WTI oil markets, leading to a super contango market dynamic as oil storage space in Cushing, Oklahoma dwindled and was insufficient to account for the excess supply expected to be delivered pursuant to the WTI May 2020 futures contract. As a result, UCO could not continue to pursue the passive investment strategy represented in the Registration Statement, causing its results to significantly deviate from its purported benchmark.

## THE TRUTH EMERGES

64.     On April 3, 2020, ProShares issued a press release that announced a 1:25 reverse

share split for UCO, and noted that the reverse split would take effect prior to the market opening

on April 21, 2020.[9]

65.     On April 22, 2020, ProShares filed on Form 424B3 with the SEC a Prospectus

Supplement.[10] This filing provided, in relevant part:

> **The Prospectus and Disclosure Document for each Oil Fund is hereby revised
> to reflect that:**
>
> As stated in the Oil Funds' Prospectus, each of the Oil Funds seeks to meet its
> investment objective by investing, under normal market conditions, in any one of,
> or combinations of, Financial Instruments (including swap agreements, futures
> contracts and forward contracts) based on WTI sweet, light crude oil. The types and
> mix of Financial Instruments in which the Oil Funds may invest vary daily at the
> discretion of the Funds' Sponsor, ProShare Capital Management LLC. Currently,
> each Oil Fund obtains its exposure by investing in the WTI crude oil futures
> contracts specified by the Bloomberg WTI Crude Oil Subindex (the "Index"). The
> Index generally consists of WTI crude oil futures contracts selected from the three
> nearest expiration dates (known as the front, second and third month contracts).
>
> In light of recent extraordinary conditions and volatility in the markets for crude oil
> and related Financial Instruments, ***each Oil Fund may utilize other investment
> strategies and Financial Instruments, as described below and in its Prospectus.
> For example, each Oil Fund may invest in longer-dated futures contracts based
> on the Sponsor's analysis of factors such as current or expected market volatility,
> margin requirements and the liquidity and cost of establishing and maintaining
> such positions.***
>
> ***In addition, each Oil Fund also may invest in other crude oil-related Financial
> Instruments, such as futures contracts on other crude oil benchmarks or indices
> (for example, ICE West Texas Intermediate (WTI) Light Sweet Crude Oil
> Futures Contract), options on crude oil futures contracts and non-exchange
> traded ("over-the-counter" or "OTC") transactions that are based on the price of
> crude oil, crude oil benchmarks or crude oil futures contracts.*** Although each Oil
> Fund will continue to seek its investment objective to deliver daily investment

---

[9] https://www.proshares.com/news/proshares_announces_share_splits_040320.html.
[10] https://www.sec.gov/Archives/edgar/data/1415311/000119312520114312/d915745d424b3.htm.

results, before fees and expenses, that correspond to two times (2x), or two times the inverse (-2x), as applicable, of the daily performance of the Index, the use of these other investment strategies and Financial Instruments could have a significant impact on the performance of each Fund and, as a result, each Fund may not meet its investment objective.

**_Each Oil Fund also may, but is not required to, seek to use swap agreements or options strategies that limit losses (i.e., have "floors") or are otherwise designed to prevent the Fund's net asset value from going to zero._** These strategies will not prevent an Oil Fund from losing value. Rather, they are intended to allow an Oil Fund to preserve a small portion of its value in the event of significant movements in the Index or Financial Instruments based on the Index. There can be no guarantee that an Oil Fund will be able to implement such strategies, continue to use such strategies, or that such strategies will be successful. **_Each Oil Fund will incur additional costs as a result of using such strategies. Use of strategies designed to limit losses may also place "caps" or "ceilings" on performance and could significantly limit Fund gains, could cause a Fund to perform in a manner not consistent with its investment objective and could otherwise have a negative impact on Fund performance._**

(Emphasis added).

66.     Also on April 22, 2020, in a press release signed by Defendant Johnson, UCO

stated, in relevant part, that:

In light of recent extraordinary conditions and volatility in the markets for crude oil and related Financial Instruments, each Oil Fund may utilize other investment strategies and Financial Instruments, as described below and in its Prospectus. For example, each Oil Fund may invest in longer-dated futures contracts based on the Sponsor's analysis of factors such as current or expected market volatility, margin requirements and the liquidity and cost of establishing and maintaining such positions.

In addition, each Oil Fund also may invest in other crude oil-related Financial Instruments, such as futures contracts on other crude oil benchmarks or indices (for example, ICE West Texas Intermediate (WTI) Light Sweet Crude Oil Futures Contract), options on crude oil futures contracts and non-exchange traded ("over-the-counter" or "OTC") transactions that are based on the price of crude oil, crude oil benchmarks or crude oil futures contracts. Although each Oil Fund will continue to seek its investment objective to deliver daily investment results, before fees and expenses, that correspond to two times (2x), or two times the inverse (-2x), as applicable, of the daily performance of the Index, the use of these other investment strategies and Financial Instruments could have a significant impact on the performance of each Fund and, as a result, each Fund may not meet its investment objective.

Each Oil Fund also may, but is not required to, seek to use swap agreements or options strategies that limit losses (i.e., have "floors") or are otherwise designed to prevent the Fund's net asset value from going to zero. These strategies will not prevent an Oil Fund from losing value. Rather, they are intended to allow an Oil Fund to preserve a small portion of its value in the event of significant movements in the Index or Financial Instruments based on the Index. There can be no guarantee that an Oil Fund will be able to implement such strategies, continue to use such strategies, or that such strategies will be successful. Each Oil Fund will incur additional costs as a result of using such strategies. Use of strategies designed to limit losses may also place "caps" or "ceilings" on performance and could significantly limit Fund gains, could cause a Fund to perform in a manner not consistent with its investment objective and could otherwise have a negative impact on Fund performance.[11]

67.     Then on April 24, 2020, Defendant ProShares Trust II filed a press release on

Form 8-K with the SEC, signed by Defendant Johnson, which provided, in relevant part:

In light of recent extraordinary conditions and volatility in crude oil markets and related Financial Instruments, ***each Oil Fund will seek to transition approximately 1/3 of its current portfolio from exposure to July 2020 WTI crude oil futures contracts into longer-dated exposure, specifically exposure to September 2020 WTI crude oil futures contracts. Each Fund expects to complete this transition by the close of business today, April 24, 2020.***

Exposure to longer-dated futures contracts could have a significant impact on the performance of the Oil Funds since these contracts currently are not included in the Funds' benchmark, the Bloomberg WTI Crude Oil SubIndex. ***As a result, the performance of each Oil Fund should <u>not</u> be expected to correspond to two times (2x), or two times the inverse (-2x), as applicable, of the daily performance of its benchmark, and each Fund's performance could differ significantly from its stated investment objective.*** In addition, to the extent an Oil Fund has exposure to longer-dated WTI crude oil futures contracts, the performance of the Fund should be expected to deviate to a greater extent from the "spot" price of WTI crude oil than if the Fund had exposure to shorter-dated futures contracts.

(Emphasis added).

---

[11] https://www.sec.gov/ix?doc=/Archives/edgar/data/1415311/000119312520114308/d911549d8k.htm.

68.     Next, on April 27, 2020, Defendant ProShares Trust II filed a press release on

Form 8-K with the SEC, signed by Defendant Johnson, which provided, in relevant part:

> On April 24, 2020, Bloomberg announced changes to the Bloomberg Commodity Index that impact the Oil Funds' benchmark - the Bloomberg WTI Crude Oil Subindex. Specifically, Bloomberg announced that the start date of the roll of the July 2020 WTI crude oil futures contract to the September 2020 WTI crude oil futures contract will be moved to an earlier date and will now occur over five days beginning on May 7, 2020. Bloomberg indicated that it is making this change in light of recent global events, including a significant oversupply in the crude oil market, a significant increase in volatility, and contango that recently resulted in a negative price in the May 2020 WTI crude oil futures contract.
>
> In response to this announcement and to help manage the impact of these market conditions, each Oil Fund will seek to transition its portfolio exposure from the July 2020 WTI crude oil futures contract into the September 2020 WTI crude oil futures contract. Specifically:
>
> • Each Fund intends to transition approximately 1/3 of its current portfolio from exposure to the July 2020 WTI crude oil futures contract into exposure to the September 2020 WTI crude oil futures contract. As a result of this transition and prior changes to each Fund's portfolio, each Fund expects to have approximately 2/3 of its portfolio exposed to the September 2020 WTI crude oil futures contract by the close of business on Monday, April 27, 2020.
>
> • Each Fund will then seek to transition the remainder of its portfolio exposure from the July 2020 WTI crude oil futures contract into exposure to the September 2020 WTI crude oil futures contract so that it is fully exposed to such contract by the close of business on Tuesday, April 28, 2020.
>
> Exposure to the September 2020 WTI crude oil futures contract in advance of the benchmark's May 7th transition period could have a significant impact on the ability of each Oil Fund to achieve its investment objective since this contract currently is not included in the Funds' benchmark. As a result, until the May 7th benchmark roll announced by Bloomberg is completed, the performance of each Oil Fund should not be expected to correspond to two times (2x), or two times the inverse (-2x), as applicable, of the daily performance of its benchmark, and each Fund's performance could differ significantly from its stated investment objective. In addition, to the extent an Oil Fund has exposure to a longer-dated WTI crude oil futures contract (e.g., September 2020 instead of July 2020), the performance of the Fund may be expected to deviate to a greater extent from the "spot" price of WTI crude oil (which the Fund does not seek to track) than if the Fund had exposure to a shorter-dated futures contract. Crude oil futures contracts (and thus each Oil

Fund) typically perform very differently from the spot price of crude oil. The performance of each Oil Fund therefore will very likely differ in amount, and possibly even direction, from the performance of the spot price of crude oil.

There can be no guarantee that each Oil Fund will be able to implement the strategies described above or in its Prospectus, continue to use such strategies, or that such strategies will be beneficial. Recent global developments affecting crude oil markets and the markets for crude oil futures contracts have dramatically increased volatility and increased the likelihood of investors suffering significant or total loss from crude oil-related investments, including an investment in an Oil Fund.[12]

69.     Next, on May 4, 2020, Defendant ProShares Trust II filed a press release on Form

8-K with the SEC, signed by Defendant Johnson, which provided, in relevant part:

As disclosed in an 8-K filed on April 27, 2020, each Oil Fund indicated, in response to the announced benchmark change and to help manage the impact of significant volatility and other market conditions, it would seek to transition its portfolio in advance of the benchmark change so that it would be fully exposed to the September 2020 WTI crude oil contract by the close of business on Tuesday, April 28, 2020.

Investments in WTI crude oil futures contracts are subject to position accountability levels and position limits set by the listing exchange for such contracts – the New York Mercantile Exchange or "NYMEX." On May 1, 2020 the Funds received notice from the exchange directing the Funds to not exceed an exchange-designated position accountability level in the September 2020 WTI crude oil futures contracts.

In response to this notice, and to help manage the impact of significant volatility and other market conditions, each Oil Fund intends to transition 1/3 of its portfolio exposure from the September 2020 WTI crude oil futures contract into exposure to the December 2020 WTI crude oil futures contract by the close of business on Monday, May 4, 2020. At such time, each Fund expects to have approximately 2/3 of its portfolio exposed to the September 2020 WTI crude oil futures contract and approximately 1/3 of its portfolio exposed to the December 2020 crude oil futures contract.

Exposure to the September and December 2020 WTI crude oil futures contract in advance of the benchmark's May 7th transition period could have a significant negative impact on the ability of each Oil Fund to achieve its investment objective

_____

[12] https://www.sec.gov/ix?doc=/Archives/edgar/data/1415311/000119312520120010/d922850d8k.htm.

since these contracts currently are not included in the Funds' benchmark. Similarly, exposure to the December 2020 WTI crude oil futures contract thereafter could also have a negative impact, as this contract is not scheduled to be included in the benchmark until the benchmark's December roll. As a result, the performance of each Oil Fund should not be expected to correspond to two times (2x), or two times the inverse (-2x), as applicable, of the daily performance of its benchmark, and each Fund's performance could differ significantly from its stated investment objective.

In addition, to the extent an Oil Fund has exposure to a longer-dated WTI crude oil futures contract (e.g., September or December 2020 instead of July 2020), the performance of the Fund may be expected to deviate to a greater extent from the "spot" price of WTI crude oil (which the Fund does not seek to track) than if the Fund had exposure to a shorter-dated futures contract. Crude oil futures contracts (and thus each Oil Fund) typically perform very differently from the spot price of crude oil. The performance of each Oil Fund therefore will very likely differ in amount, and possibly even direction, from the performance of the spot price of crude oil.[13]

70.     As a result of these sudden and dramatic changes, UCO's investment strategy was fundamentally different from the strategy represented to investors in the Registration Statement. Indeed, as had become apparent, UCO's stated passive strategy was not feasible during the Class Period because of the undisclosed adverse trends that UCO was experiencing, as detailed herein.

71.     As a result of Defendants' wrongful acts and omissions, Plaintiff and the Class purchased UCO securities at artificially inflated prices, suffering significant losses, and were damaged thereby.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired UCO securities between March 6, 2020 and April 27, 2020, inclusive. Excluded from the

---

[13] https://www.sec.gov/ix?doc=/Archives/edgar/data/1415311/000119312520131615/d923597d8k.htm. Also on May 4, 2020, ProShares Trust II filed a Prospectus Supplement that contained similar statements as this May 4, 2020 press release. *See* https://www.sec.gov/Archives/edgar/data/1415311/000119312520131638/d925512d424b3.htm.

Class are Defendants, directors and officers of UCO and/or the Sponsor, as well as their families and affiliates.

73.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

74.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.  Whether Defendants violated the Exchange Act;

    b.  Whether Defendants omitted and/or misrepresented material facts;

    c.  Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e.  Whether the price of the Company's stock was artificially inflated; and

    f.  The extent of damage sustained by Class members and the appropriate measure of damages.

75.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

76.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

77.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUD ON THE MARKET

78.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

   a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b.   The omissions and misrepresentations were material;

   c.   UCO's securities traded in efficient markets;

   d.   The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of UCO securities; and

   e.   Plaintiff and other members of the class purchased UCO securities between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

79.     At all relevant times, the markets for UCO securities were efficient for the following reasons, among others: (i) ProShares Trust II filed periodic public reports with the SEC; and (ii) Defendants regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of UCO securities, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

80.     The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

81.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION

82.     Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of UCO securities and operated as a fraud or deceit on purchasers of UCO securities. The day before the beginning of the Class Period, March 5, 2020, UCO shares closed at approximately $282.25  each (or $11.29 when that amount is divided by 25, in light of the April 21, 2020 1:25 reverse split). The day after the close of the Class Period, April 28, 2020, UCO shares closed at $12.04 per share (or approximately $0.481 when that amount is divided by 25, in light of the April 21, 2020 1:25 reverse split).

83.     As detailed above, when the truth about defendants' misconduct was revealed, the value of UCO securities declined precipitously as the prior artificial inflation no longer propped up the prices of such securities. The declines in the prices of UCO securities were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price declines negate any inference that the losses suffered by plaintiff and members of the Class were caused by changed market conditions, macroeconomic or industry factors or Fund-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate the prices of UCO securities and the

subsequent significant decline in the value of UCO securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

84.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and the members of the Class. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of UCO's business and operations, as alleged herein. Before and during the time of Plaintiff's and Class members' purchases of UCO securities, Defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of UCO securities to be artificially inflated. Plaintiff and members of the Class purchased UCO securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

<u>**Count One**</u>
**Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

85.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

86.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii)

engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired UCO securities during the class period.

88.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for UCO securities. Plaintiff and the Class would not have purchased UCO securities at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## Count Two
## Violation of § 20(a) of the Exchange Act
## (Against the Individual Defendants)

89.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

90.     The Individual Defendants acted as controlling persons of UCO and/or the Sponsor within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at UCO and/or the Sponsor, the Individual Defendants had the power and authority to cause or prevent UCO and/or the Sponsor from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

31

(b)      awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)      awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)      awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: July 28, 2020                        Respectfully submitted,

*/s/ Jeffrey C. Block*
Jeffrey C. Block
Stephen J. Teti
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
steti@blockleviton.com

*Attorneys for Plaintiff and Proposed Lead Counsel*