**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LUCIANO DI SCALA, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:20-cv-05865-NRB |
| Plaintiff, | |
| v. | |
| PROSHARES ULTRA BLOOMBERG CRUDE OIL, PROSHARE CAPITAL MANAGEMENT LLC, PROSHARES TRUST II, MICHAEL L. SAPIR, TIMOTHY N. COAKLEY, and TODD B. JOHNSON, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT**
**OF MOTION OF HONGGUI QU FOR APPOINTMENT AS**
**LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL**

Lead Plaintiff Movant Honggui Qu ("Qu") respectfully submits this reply memorandum of law in further support of his motion for appointment as lead plaintiff. Dkt. No. 37.

## I.    INTRODUCTION

There are currently three movants vying to be appointed lead plaintiff: Qu, Pinchas Dan Danino ("Danino"); and Edmund Jin ("Jin"), allegedly on behalf of an individual named Jin Yuan Zhao.[1] While Jin appears to have the largest financial interest of the three movants, he should not be appointed lead plaintiff since his losses are the result of a series of complicated options transactions which render him inadequate and atypical. At this point, Jin has failed to provide enough information to the Court to determine if all, or just a percentage, of his losses are the result of writing put options and then subsequently being forced to cover these options. As such, if Jin failed to disclose that certain of his transactions were the result of pre-Class Period options transactions, his certification and losses were materially false and misleading, seriously calling into question his adequacy. *See* Dkt. No. 46 ("Qu Opp.") at 5-7.

Even if the Court were to find that Jin's transactions were presented properly, these elaborate options transactions are atypical of the other class members that purchased common stock on the open market, and Courts in this district have recently disqualified such movants from lead plaintiff consideration. *See* Qu Opp. at 3-7; *see, e.g., Cook v. Allergan PLC*, 18-cv-12089-CM, 2019 WL 1510894, at *2 (S.D.N.Y. Mar. 21, 2019) (an individual investor for whom "approximately 60% of his claimed losses came as a result of options trading" would not "be typical of the average common stockholder within the meaning of Fed. R. Civ. P. 23(a)(3)").

---

[1] The three other movants that originally filed lead plaintiff motions have either informed the Court that they do not oppose the competing motions (*see* Dkt. No. 45), withdrawn their motion (*see* Dkt. No. 50), or abandoned their motion (*see* Dkt. No. 41).

Realizing that movant Qu clearly has the largest financial interest of any other movant, Danino now puts forward a new method for calculating financial interest that he claims is based on principles articulated in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005)—not mentioned in his opening papers—which unsurprisingly enables Danino to claim a larger loss than Qu. Courts routinely reject such transparent attempts by lead plaintiff movants to game the process by shifting to different loss calculation methodologies after reviewing competing motions. *See, e.g.*, *Allergan* 2019 WL 1510894, at *3 (denying motion of movant who "used the same methodology as [a competing movant] in its original moving papers - only to alter its calculation when it learned that someone else had a larger loss").

Even setting aside this blatant gamesmanship, "the appropriateness of employing *Dura* analysis at the lead plaintiff stage is subject to considerable dispute," and it is not appropriate here. *Id.* This is because *Dura* articulated a pleading standard for claims arising under Section 10(b) of the Securities Exchange Act of 1934, not a loss accounting methodology, and courts generally decline to assess financial interest with reference to the principles articulated in *Dura* at this stage of the litigation. *See, e.g.*, *Blitz v. AgFeed Indus., Inc.*, No. 11-cv-0992, 2012 WL 1192814, at *4 (M.D. Tenn. Apr. 10, 2012) ("*Dura*, however, was not a case involving the appointment of a Lead Plaintiff under the PSLRA, and *Dura* does not discuss FIFO or LIFO losses."). The hazards of attempting to consider a *Dura* accounting methodology are demonstrated here, where both Jin and Danino have claimed to have performed such an analysis, yet their results are worlds apart. Jin claims that Qu's *Dura* loss is $1,324,895, while Danino claims Qu has a *Dura* gain of $311,948—a difference of approximately $1.6 million. *Compare* Dkt. No. 49-1 *with* Dkt. No. 47-1. No consistent *Dura* method was applied. In fact, it appears

2

that Jin and Danino tailored their respective methodologies to get to the result that they were looking for. Danino's gamesmanship should be rejected.

In sum, Qu has the largest financial interest of the remaining movants under the LIFO methodology, which is near universally accepted and was used by all remaining movants in their opening motions. As such, Qu is the presumptively most adequate plaintiff. Since no other movant has successfully rebutted this presumption, Qu should be appointed lead plaintiff and his selected counsel, Glancy Prongay & Murray LLP, should be approved.

## II.   ARGUMENT

### A.   Movant Jin Is Inadequate, Atypical, Subject to Unique Defenses, and Has Yet to Disclose Whether All His Class Period Stock Purchases Were the Result of Options Transactions

As outlined in Qu's opposition brief, almost all of Jin's losses were the result of highly unusual options transactions—essentially a series of side bets as to short-term UCO price movants. As such, his motion should be denied since he is both atypical and subject to unique defenses. *See* Qu Opp. at 3-7. While it is clear that most of Jin's losses were the result of options transactions, it is unclear whether all of his losses were the result of these types of transactions since Jin's opening and opposition memoranda were completely devoid of any discussion regarding whether any of his Class Period transactions were the result of pre-Class Period options transactions. If Jin finally addresses this issue in his reply memorandum, Qu respectfully requests the opportunity to respond to such new information or to conduct limited discovery to verify these new facts. Whether all of Jin's transactions were the result of options is of utmost importance because if they are, he filed a misleading certification and loss chart with the Court, demonstrating his lack of candor and calling into question his ability to be a fiduciary for the class.

### B.    Qu Is the Most Adequate Plaintiff of the Remaining Movants

All movants used the LIFO methodology to calculate their respective losses in their opening papers and there was no mention of any purported "*Dura*" methodology. After all lead plaintiff motions were filed, it was clear that Qu had the second largest financial loss, behind only Jin. *See* Qu Opp. at 7-9. Since Jin is atypical and subject to unique defenses, Qu becomes the presumptively most adequate plaintiff since he is the *bona fide* movant with the greatest financial interest. Danino, however, realizing that he has a smaller loss than Qu, now argues that an alternative to the LIFO methodology should be used. Danino's last-ditch attempt to change methodologies in the hope of becoming lead plaintiff runs afoul of the spirit of the PSLRA, and is not supported by the facts or the law. Qu has the largest financial interest under the original methodology advanced by Danino. Qu has the largest financial interest in the relief sought by the class, and Qu is the presumptively most adequate plaintiff.

### 1.    Danino's Application of a New Loss Calculation Methodology Is Improper Gamesmanship Not Permitted Under the PSLRA

Danino makes no mention of any "recoverable loss" or purported "*Dura*" methodology in his opening memorandum. *See* Dkt. No. 32 at 7-8.[2] Only after it was clear that Danino had a smaller loss than Qu, did Danino argue that this new methodology should be employed. Dkt. No. 47 at 6-7. "The [PSLRA] is unequivocal and imposes precise time requirements" so lead plaintiff movants cannot "manipulate the size of their financial loss,' and any "'supplementation after the expiration of the sixty (60) day [PSLRA motion deadline] would not only be inconsistent with the language and purpose of the PSLRA but would effectively nullify the time limits expressly provided therein.'" *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 438-39 (S.D. Tex. 2002)

---

[2] Jin also did not mention either of these methodologies in his opening memorandum. *See* Dkt. No. 22.

(quoting *In re Texlon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999)). Therefore, courts do not countenance such gamesmanship and manipulation. *See, e.g.*, *Singer v. Nicor, Inc.*, No. 02-cv-5168, 2002 WL 31356419, at *3 (N.D. Ill. Oct. 17, 2002) ("the court will not consider the candidates' amendments of their amount of financial loss made after the filing deadline"); *In re Able Labs. Sec. Litig.*, 425 F. Supp. 2d 562, 566 (D.N.J. 2006) ("the loss amount to consider for purposes of the [lead plaintiff] motion is the number from the original" motion papers).

Danino and his counsel should not be rewarded for trying to advance a new financial interest analysis for the first time in the opposition papers.[3] Allowing such practices, where movants simply revise their damages methodologies in oppositions and replies until they find one that puts them in the lead, runs directly counter to the purpose of the PSLRA and "encourage[s] parties seeking lead plaintiff status to manipulate the size of their financial loss." *Miller v. Dyadic Int'l, Inc.*, No. 07-cv-80948, 2008 WL 2465286, at *5 (S.D. Fla. Apr. 18, 2008) (internal quotation marks omitted) ("many courts have [restricted] lead plaintiff applicants to the claims and calculations in their initial lead plaintiff applications, regardless of subsequent revisions") (collecting cases). Faced with a similar situation, Judge McMahon recently denied the motion of a movant that "used the same methodology as [a competing movant] in its original moving papers—only to alter its calculation when it learned that someone else had a larger loss." *Allergan*, 2019 WL 1510894 at *3. The same result is warranted here, where all movants used the LIFO methodology in their opening motions. *See Nicolow v. Hewlett Packard Co.*, No. 12-05980-CRB, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013) (denying motion by movant who "[t]ellingly . . . made no reference to [alternative] calculation[s] in its opening motion seeking

---

[3] Ironically, in an earlier case in front of this Court, counsel for Danino argued for the use of LIFO instead of "compensable losses." *See Gronich v. Omega Healthcare Inv'rs, Inc.*, No.-cv-8983-NRB, 2018 WL 1626078, at *3 n.3 (S.D.N.Y. Mar. 27, 2018).

appointment as lead plaintiff, shifting its argument only after [a competing movant] came forward with larger LIFO losses").

> **2.** ***Dura* Principles Should Not Be Applied to Assess Financial Interest at the Lead Plaintiff Appointment Stage**

Setting aside the timing of Danino and Jin's methodology shift, courts generally do not apply a loss causation methodology premised on *Dura* principles at the lead plaintiff appointment stage. *See, e.g., Allergan*, 2019 WL 1510894, at *3 ("the appropriateness of employing *Dura* analysis at the lead plaintiff stage is subject to considerable dispute"); *Blitz v. AgFeed Indus., Inc.*, No. 11-cv-0992, 2012 WL 1192814, at *4 (M.D. Tenn. Apr. 10, 2012) (*Dura* "was not a case involving the appointment of a Lead Plaintiff under the PSLRA, and *Dura* does not discuss FIFO or LIFO losses"). *Dura* merely articulates a pleading standard for securities fraud claims alleging violations of Section 10(b) of the Exchange Act—namely, that "a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss," and not a lead plaintiff loss accounting methodology. *Dura*, 544 U.S. at 346. In *Watchguard,* the Court expressly declined to look to *Dura* in assessing the financial interest of a lead plaintiff movant, explaining that:

> [The movant's] citation to the discussion of securities class action damages in *Dura* . . . is inapposite. The *Dura* court held that a plaintiff needed to do more than allege the purchase of stock at a fraud-inflated price in order to plead loss causation. . . . The Supreme Court recognized, as does this court, that numerous factors may affect the price of a security. . . . The Supreme Court did not suggest that a court should guess about the effect of these as-yet-unknown factors in selecting a lead plaintiff, nor did it consider the issue.

*In re Watchguard Sec. Litig.*, No. 05-cv-00678-JLR, 2005 U.S. Dist. LEXIS 40923, n.6. (W.D. Wash. July 13, 2005).

Demonstrating the *ad hoc* nature of this purported *Dura* methodology, both Jin and Danino claim to perform a proper analysis under *Dura*, yet get results that are drastically

different. Jin claims that Qu has a *Dura* LIFO loss of $1,324,895 while Danino claims that Qu has a *Dura* LIFO **gain** of $311,948. *Compare* Dkt. No. 49-1 *with* Dkt. No. 47-1. Certainly, these movants cannot expect the Court to adopt a methodology that can be this inconsistently applied. *See Allergan*, 2019 WL 1510894, at \*3 (determining whether a single *Dura* analysis is correct "is beyond the scope of a lead plaintiff appointment motion," let alone two extremely different ones).

A review of the allegations in the operative complaint illustrates why calculations of financial interest with reference to the pleading standard articulated in *Dura* is inappropriate at this stage of the litigation. Here, the operative complaint alleged certain corrective disclosures in April 2020, without any reference to specific price declines in the securities. *See* Dkt. No. 1 at ¶¶ 64-68.[4] In Danino's purported *Dura* analysis, he apparently ignored all transactions before the announcement of the stock split on April 3, 2020. *See* Dkt. No. 49-1; Dkt. No. 1 at ¶ 64 ("On April 3, 2020, ProShares issued a press release that announced a 1:25 reverse share split for UCO, and noted that the reverse split would take effect prior to the market opening on April 21, 2020."). There are two problems with this. First, it is unclear how exactly an announcement of a reverse stock split constitutes a corrective disclosure. In fact, the claim that it is a corrective disclosure appears to be supported only by the thin thread that the firm that drafted the initial complaint, which has subsequently withdrawn its lead plaintiff motion, merely mentioned the stock split under the heading "The Truth Emerges." Second, there are many allegations

---

[4] The four partial disclosures alleged demonstrates that there was a varied fraud premium—the amount inflation of the security—throughout the Class Period which further demonstrates the impropriety of applying a *Dura* methodology. *See Fialkov v. Celladon Corp.*, No. 15-cv-1458-AJB-DHB, 2015 WL 11658717, at \*5 (S.D. Cal. Dec. 9, 2015) (rejecting a *Dura* analysis where there were partial corrective disclosures: "At this stage in the proceedings, the Court is inclined to adopt the most expansive view of potential recovery in determining which party has the greatest financial interest for the appointment as lead plaintiff.").

7

throughout the complaint that occurred earlier than the April 3, 2020 stock split that could constitute partial corrective disclosures. For example, the complaint discusses that in March 2020 the price of oil fell as governments imposed lockdowns due to COVID-19, and Saudi Arabia and Russia launched an oil price war and slashed export prices of oil. *See,* Dkt. No. 1 at ¶ 5. In sum, it makes no sense to determine financial interest by digging into the minutiae of a sparce thirty-two-page initial complaint, to implement a methodology which movants disagree on how to apply.

Moreover, when a lead plaintiff is appointed, and an amended complaint is filed, it is quite likely that the new lead plaintiff will add additional corrective disclosures after conducting an in-depth review of all potential corrective disclosures. As such, the Court should use the widely-accepted, traditional, and consistent LIFO method for determining financial interest, which is not reliant on what is contained in a threadbare initial complaint written by counsel that are no longer involved in the action.

### C. The Presumption That Qu Is the Most Adequate Plaintiff Has Not Been Rebutted

The presumption that Qu is the most adequate plaintiff may be rebutted only upon "proof" that he "will not fairly and adequately protect the interests of the class," or "is subject to unique defenses that render [him] incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Here, Danino, essentially conceding that Qu is the most adequate plaintiff, attempts to rebut the presumption by arguing that Qu is subject to a unique defense that he is an in-and-out trader. *See* Dkt. No. 47 at 6. This argument is meritless.

Danino's cites only one case to argue that Qu is atypical: *In re Bally Total Fitness Sec. Litig.*, No. 04-cv-3530, 2005 WL 627960 (N.D. Ill. Mar. 15, 2005) (cited in Dkt. No. 47 at 6). *Bally* rejected the lead plaintiff motion of an "in-and-out" trader who "purchased and then sold

all of its stock during the class period, many months before the alleged fraud was first revealed." *Id.* at *5-*6. However, Qu is not an in-and-out trader. The operative complaint in this action alleges in a section entitled "The Truth Emerges" that there were at most four corrective disclosures on April 3, 22, 24 and 27, 2020. *See* Dkt. No. 1 at ¶¶ 64-68. Qu held UCO shares through all of these corrective disclosures. *See* Dkt. No. 39-3. As such, he is not an in-and-out trader and is not subject to any unique defenses.[5]

Moreover, no other movant successfully calls into question Qu's adequacy. This is unsurprising since Qu provided a declaration describing his sophistication, experience, and commitment to serving as a faithful fiduciary to the class, along with an opening motion demonstrating his adequacy. *See* Dkt. Nos. 38; 39-4; *Perez v. HEXO Corp.*, No. 19-cv-10965-NRB, 2020 WL 905753, at *4 (S.D.N.Y. Feb. 25, 2020) (finding movants adequate based on a declaration laying out their sophistication and experience).

Since no other movant has rebutted the presumption that Qu is the most adequate plaintiff, Qu should be appointed as lead plaintiff, and no other movant is entitled to consideration. *See Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 344 (S.D.N.Y. 2009) (the lead plaintiff process ends when "a candidate succeeds in both the first and second phases of inquiry").

---

[5] Even if Qu held shares through only one corrective disclosure, he would still be an adequate lead plaintiff. *See Weiss v. Friedman, Billings, Ramsey Grp., Inc.*, No. 05-cv-04617-RJH, 2006 WL 197036, at *5 (S.D.N.Y. Jan. 25, 2006); see also *Montoya v. Mamma.com Inc.,* 2005 WL 1278097, at *2 (S.D.N.Y. May 31, 2005) (appointing a lead plaintiff that did not hold any shares through the end of the class period, but sold a substantial portion of its shares after a partial disclosure, because "the subject of the fraudulent statement or omissions was the cause of the actual loss suffered") (internal quotation marks omitted).

## III.    CONCLUSION

For the foregoing reasons, Qu respectfully requests that the Court grant his motion and enter an Order: (1) appointing Qu as lead plaintiff; (2) approving Qu's selection of Glancy Prongay & Murray LLP as lead counsel for the class; and (3) denying the competing motions.

Respectfully submitted,

Dated: October 20, 2020                    **GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Gregory B. Linkh*
Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Honggui Qu and Proposed Lead*
*Counsel for the Class*

10

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On October 20, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Eastern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 20, 2020, at New York, New York.

*/s/ Gregory B. Linkh*
Gregory B. Linkh